UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRANCIS JANIK,

                    Plaintiff,

        - against -

MEDIAPOST COMMUNICATIONS, INC.
                    Defendant.

Docket No. _____

JURY TRIAL DEMANDED

---

## COMPLAINT

Plaintiff Francis Janik ("Janik" or "Plaintiff") by and through his undersigned counsel, as and for his Complaint against Defendant MediaPost Communications, Inc. ("MediaPost" or "Defendant") hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for copyright infringement under Section 501 of the Copyright Act and for the removal and/or alteration of copyright management information under Section 1202(b) of the Digital Millennium Copyright Act. This action arises out of Defendant's unauthorized reproduction and public display of a copyrighted photograph of Bob Guccione, Jr. owned and registered by Janik, a Vermont based photojournalist. Accordingly, Janik seeks monetary relief under the Copyright Act of the United States, as amended, 17 U.S.C. § 101 *et seq*.

### JURISDICTION AND VENUE

2.      This claim arises under the Copyright Act, 17 U.S.C. § 101 *et seq*., and this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.    This Court has personal jurisdiction over Defendant because Defendant resides in and/or are doing business in New York.

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

### PARTIES

5.    Janik is a professional photojournalist in the business of licensing her photographs to online, print, and television stations for a fee, having a usual place of business at 501 Melis Road, Jamaica, Vermont, 05343.  Janik's photographs have appeared in many publications around the United States.

6.    Upon information and belief, MediaPost is a corporation duly organized and existing under the laws of the State of New York, with a place of business at 15 East 32nd Street, 7th Fl., New York, New York, 10016. At all times material hereto, MediaPost has owned and operated a website at the URL: www.mediapost.com (the "Website").

### STATEMENT OF FACTS

**A.    Background and Plaintiff's Ownership of the Photograph**

7.    In the 1980's, Janik photographed Bob Guccione, Jr. (the "Photograph"). A true and correct copy of the Photograph is attached hereto as Exhibit A.

8.    Janik is the author of the Photograph and has at all times been the sole owner of all right, title and interest in and to the Photograph, including the copyright thereto.

9.    The Photograph was given pending United States Copyright Registration Number 1-2963387455. See Exhibit B.

**B.    Defendant's Infringing Activities**

10.    Upon information and belief, on July 4, 2015, MediaPost ran an article on the Website entitled *The Return of the Prodigal Editor: Guccione Takes Another SPIN*. See

http://www.mediapost.com/publications/article/253265/the-return-of-the-prodigal-editor-guccione-takes.html.  The article prominently featured the Photograph. A true and correct copy of the article is attached hereto as Exhibit C.

11.     MediaPost did not license the Photograph from Plaintiff for its article, nor did MediaPost have Plaintiff's permission or consent to publish the Photograph on its Website.

## FIRST CLAIM FOR RELIEF
## (COPYRIGHT INFRINGEMENT AGAINST MEDIAPOST)
## (17 U.S.C. §§ 106, 501)

12.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1-11 above.

13.     MediaPost infringed Plaintiff's copyright in the Photograph by reproducing and publicly displaying the Photograph on the Website. MediaPost is not, and has never been, licensed or otherwise authorized to reproduce, publically display, distribute and/or use the Photograph.

14.     The acts of Defendant complained of herein constitute infringement of Plaintiff's copyright and exclusive rights under copyright in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

15.     Upon information and belief, the foregoing acts of infringement by MediaPost have been willful, intentional, and purposeful, in disregard of and indifference to Plaintiff's rights.

16.     As a direct and proximate cause of the infringement by the Defendant of Plaintiff's copyright and exclusive rights under copyright, Plaintiff is entitled to damages and defendant's profits pursuant to 17 U.S.C. § 504(b) for the infringement.

17.     Defendant's conduct, described above, is causing, and unless enjoined and restrained by this Court, will continue to cause Plaintiff irreparable injury that cannot be fully compensated by or measured in money damages.  Plaintiff has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**INTEGRITY OF COPYRIGHT MANAGEMENT INFORMATION AGAINST**
**MEDIAPOST**
**(17 U.S.C. § 1202)**

18.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1-17 above.

19.     The conduct of MediaPost violates 17 U.S.C. § 1202(b).

20.     Upon information and belief, MediaPost's falsification, removal and/or alteration of the aforementioned copyright management information was made without the knowledge or consent of Plaintiff.

21.     Upon information and belief, the falsification, alteration and/or removal of said copyright management information was made by MediaPost intentionally, knowingly and with the intent to induce, enable, facilitate, or conceal their infringement of Plaintiff's copyrights in the Photograph. MediaPost also knew, or should have known, that such falsification, alteration and/or removal of said copyright management information would induce, enable, facilitate, or conceal their infringement of Plaintiff's copyrights in the Photograph.

22.     As a result of the wrongful conduct of MediaPost as alleged herein, Plaintiff is entitled to recover from MediaPost the damages, that he sustained and will sustain, and any gains, profits and advantages obtained by MediaPost because of their violations of 17 U.S.C. § 1202, including attorney's fees and costs.

23.    Alternatively, Plaintiff may elect to recover from MediaPost statutory damages pursuant to 17 U.S.C. § 1203(c)(3) in a sum of at least $2,500 up to $25,000 for each violation of 17 U.S.C. § 505;

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

1.    That Defendant MediaPost be adjudged to have infringed upon Plaintiff's copyrights in the Photograph in violation of 17 U.S.C §§ 106 and 501;

2.    The Defendant MediaPost be adjudged to have falsified, removed and/or altered copyright management information in violation of 17 U.S.C. § 1202.

3.    Plaintiff be awarded Plaintiff's actual damages and Defendant's profits, gains or advantages of any kind attributable to Defendant's infringement of Plaintiff's Photograph.

4.    That, with regard to the Second Claim for Relief, Plaintiff be awarded either: a) Plaintiff's actual damages and Defendant's profits, gains or advantages of any kind attributable to Defendant's falsification, removal and/or alteration of copyright management information; or b) alternatively, statutory damages of at least $2,500 and up to $ 25,000 for each instance of false copyright management information and/or removal or alteration of copyright management information committed by Defendant pursuant to 17 U.S.C. § 1203(c);

5.    That Defendant be required to account for all profits, income, receipts, or other benefits derived by Defendant as a result of its unlawful conduct;

6.    That Plaintiff be awarded his costs, expenses and attorneys' fees pursuant to 17 U.S.C. § 505;

7.    That Plaintiff be awarded pre-judgment interest; and

8.    Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable in accordance with Federal

Rule of Civil Procedure 38(b).


Dated: Valley Stream, New York
        July 21, 2016

                                        LIEBOWITZ LAW FIRM, PLLC

                                        By: /s/Richard Liebowitz
                                            Richard P. Liebowitz
                                        11 Sunrise Plaza, Suite 301
                                        Valley Stream, NY 11580
                                        Tel: (516) 233-1660
                                        RL@LiebowitzLawFirm.com

                                        *Attorney for Plaintiff Francis Janik*

# EXHIBIT A



# EXHIBIT B

Registration Number
**\*-APPLICATION-\***

## Title

**Title of Work:**  Bob Guccione, Jr.

## Completion/Publication

**Year of Completion:**  1985

## Author

- **Author:**  Fran Janik
  **Author Created:**  photograph
  **Citizen of:**  United States
  **Domiciled in:**  United States

## Copyright Claimant

**Copyright Claimant:**  Fran Janik
501 Melis Road, PO Box 181, Jamaica, VT, 05343, United States

## Certification

**Name:**  Richard Liebowitz
**Date:**  December 16, 2015

# EXHIBIT C

7/18/2016                        The Return Of The Prodigal Editor: Guccione Takes Another SPIN 07/04/2015

Case 1:16-cv-05872-ALC     Document 9-3     Filed 12/23/16     Page 12 of 16
Case 1:16-cv-05872-ALC   Document 1-3   Filed 07/21/16   Page 2 of 6



The Editors Select the
Week's Best Stories

(/publications/mediapost-weekend/)

# The Return Of The Prodigal Editor: Guccione Takes Another SPIN

by Joe Mandese (/publications/author/1629/joe-mandese/) @mp_joemandese (http://www.twitter.com/mp_joemandese), July 4, 2015, 3:32 PM



*In what likely is the first time a founder has returned to guest edit a magazine he created, Bob Guccione Jr. has returned to SPIN as a guest editor leading up to a special edition of SPIN in October. The role is noteworthy for several reasons, including the fact that Guccione is known for inviting special guests to edit SPIN in its heyday. It's one of several projects he has in the hopper, including a new series of "bookazines" about rock and roll legends that will begin hitting newsstands in the next few weeks, including one about Jimi Hendrix, followed by one about Led Zeppelin. In the following interview with MediaPost Weekend, Guccione explains that you can go home again, and why it might be time for magazines -- even the digital kind -- to go back to their roots of great storytelling and setting the cultural agenda.*

**MediaPost Weekend**: You are well associated with the guest editing concept. You introduced that to *SPIN* early on and gave new dimensions to the magazine with editors like Spike Lee and Amnesty International. You even introduced the idea to MediaPost's *MEDIA* magazine, and you were its first guest editor back in 2008. What attracted you about going back and guest editing *SPIN*?

**Bob Guccione Jr.**: It's *SPIN*'s 30th anniversary, and I don't think a founder who sold a publishing company ever came back to guest edit it. And 30 years is a big deal, because it is more than a generation. When I walked into the SPIN offices to begin this project -- which was the first time I walked in since the day I walked out -- nobody in the room was alive when *SPIN* was launched. Everyone was under 30. That says a lot. And when you think about it, there aren't that many magazines that

have even been around for 30 years. It's probably a small number. Maybe under 100 that are available today that have been continuously publishing for more than 30 years. It's no longer a print title, but that's not unusual today.

**MW**: What do you think has changed about the magazine and its readers since you sold it?

**Guccione**: When I sold it, I told the new owner, "Remember, *SPIN* is not a music magazine. And he nearly fell off his seat, because he just spent $43.5 million buying what he thought was a music magazine. But *SPIN* was really a magazine for young people making the transition from adolescence to young adulthood. And there have been a lot of very important cultural and sociological issues discussed in those pages. Music has been the glue and the soundtrack, but it's not the magazine. Those young people who read it for music also care about sex, relationships, the economy, politics, where they live, what they eat. It is about the things that interest the age group. Over time, it mutated to a very, very music-centric magazine and it stopped being an instigator of provocative social commentary. I want to do this to remind people how vital the youth culture is. I want to stir that up again, because I think there is a very interesting -- but not in a good way -- dynamic about youth culture today, which is that it seems strangely, oddly unperturbed and unexcited. It seems to be so commodified by the big corporations and advertisers.

**MW**: So what's in it for Bob Guccione Jr., other than the fact that this is your baby and it is your legacy? You no longer have any business interest in it, so why do you want to reboot it in that way?

**Guccione**: It is my baby and I've always had a fondness for it. But we say things like, "This is your child," but it's not really your child. It's your work and when I sold it, it was no longer my work. But the 30th anniversary is a landmark and I thought it would be sinful if it drifted by like a shadow and nobody marked it. I thought it would be good for a completely new generation to encounter the kind of journalism that most online journalism today doesn't allow for. I think SPIN probably posts more pieces in a day today than we used to publish in a monthly issue. And that new form of publishing, in many ways, has buried that thoughtful, month-long research and reporting of articles that we did. It's a very, very different mentality now and I thought it would be great to show people some of that, because the majority of its readers today have never seen that -- the old SPIN. That's what's in it for me.

**MW**: How will that manifest? It's no longer a linear, print magazine. Will there be a beginning, middle and an end to this guest editing project? When can readers expect to see your handiwork?

**Guccione**: It's a process. We are taking an old form of journalism and translating it into a new form. There are two parts to it. The first is -- we are taking 30 of the best stories of the last 30 years. About two-thirds of that are stories from my time as editor, which was only about a third of the time that *SPIN* has been publishing, but it was the time when the magazine was most invested in very long-form, serious journalism -- exposes and investigative pieces.

Some of those stories are really iconic, like the Live Aid expose we ran showing how Live Aid was a complete screw-up, all due to [organizer Bob] Geldof's massive narcissism. Or our AIDS coverage, particularly exposing the fact that AZT was more deadly than the disease, which helped transform the way the media reported on AIDS and AIDS research. We are publishing one of those a week for 30 weeks. We just started by publishing the piece we did on Ike Turner at a time when Tina Turner was at the height of her success. She thought Ike was dead. No one knew where he was. At a time when everyone was talking about Tina, we said what about Ike. After weeks, we finally found him -- and did this great profile showing him to be a complex, broken man, but he was one of the guys who invented rock and roll. I'm curating those 30 stories.

The second thing we are doing is really interesting, because we've come a long way. Thirty years is a long time. It is literally half my life. So we wanted to explore what will music be like over the next 30 years. Where will music and people and culture be 30 years from now? It's the future of music, but in a larger context. We're going to talk to people like Bill Joy and Ray Kurzweil and Jaron Lanier and Tim Cook -- the great, great thinkers of our time, as well as music industry figures. I want to know where they think it will be at a time, frankly, when many of us might not be alive. What will it be like?

We'll also have fun with a lot of 30s lists. One of them is "Thirty things you would do if you woke up and found Madonna lying next to you." Things like that. Have fun with the culture.

I call it a special edition; the current staff call it a "package," or a "takeover." But it will be one, sweeping package that I hope will cure all their ills.

**MW**: How and when will readers be able to experience that?

**Guccione**: In October. The whole year leading up to that is an anniversary, but the exact anniversary is March 19, 1985. One of the articles we want to do during this period is a profile on somebody that was born on March 19, 1985, because their life is *SPIN*s life.

7/18/2016    Case 1:16-cv-05872-ALC    The Return Of The Prodigal Editor: Guccione Takes Another SPIN 07/04/2015    Page 5 of 6

**MW**: You said the purpose of *SPIN* was not to be a music magazine per se, but a way of helping young people transition from adolescence to young adulthood. Do you think it's true today that a young people would look to a magazine to do that?

**Guccione**: With the exception of *Rolling Stone*, I don't think they had ever done that before *SPIN*. *Rolling Stone* wasn't just about music. It talked about politics, the war in Vietnam. That's what I took from Rolling Stone, that it was a publication its readers trusted because it didn't have the corporation at heart. I still think *Rolling Stone* is a great magazine. I still read it and I have a lot of respect for *Rolling Stone*'s history and for Jann Wenner. And I've always been clear that *SPIN* was modeled on *Rolling Stone*. What *Rolling Stone* was for its generation, I wanted *SPIN* to be for my generation.

But to answer your question, I think the answer is no, I don't think young people do that today, because they aren't being offered a choice. Today, especially with the metastasization of media, everything is so fractionalized. That doesn't mean that the people who are consuming it in this fractionalized way wouldn't also like to consume something that holistically defined their times for them. I think people take the concept of "defining your times" as such a cliche that they don't think about what it means. If you think about the old *SPIN*, we had an AIDS scientist, and we interviewed criminals and police people and we were in war zones, and we were one of the first

publications to report on the growing Islamic distaste for America. We covered the Berlin wall coming down, and what it was like for young people coming back and forth. We had a reporter in Tiananmen Square [China] and the next day the tanks came in.

Bookazine



**MW**: Is there anything you see out there today in terms of the current digital publishing world, whether it's a BuzzFeed or a VICE that is hot today, being around 30 years from now -- and being of the magnitude where one of its founders would come back and guest edit it?

**Guccione**: Well, think about VICE. What is VICE? It's just *SPIN* in concept. They didn't do anything different. When it first came out, it was just a free magazine in skate shops. I thought it was pretty cool. It was an evolution of us, just like we were an evolution of *Rolling Stone*. Spiritually, VICE was a copy of *SPIN*.

Secondly, there are many, many publications that will be around 30 years from today and will have a great magnitude. Start with *ESPN* [magazine]. I don't see why *Rolling Stone* wouldn't be around in 30 years -- in some form -- as long as it continues to have its energy. I think you'll see a lot of publications not be around. I think maybe the *Vanity Fair*s of the world might not be around. BuzzFeed, if they

continue to be as smart as they obviously are -- they already are evolving and they're already anticipating the end of the vapid post and are starting to lay down some substantial reporting. *SPIN* should be there in 30 years. It would be their fault if they weren't. I think a lot of the legacy titles like *Sports Illustrated* won't be, but *ESPN* will, because I think they have adapted. It's Darwinian.

As to founders coming back, it depends on whether they adapt. I know I won't. I don't know if I'll be alive at 90, but I can see Shane Smith selling VICE one day and returning in 30 years to do it. If I had to pick one individual by name, I'd pick Shane Smith.

## 50 SHARES

Recommend (5)

*All content published by MediaPost is determined by our editors 100% in the interest of our readers ... independent of advertising, sponsorships or other considerations.*

**1 comment** about "The Return Of The Prodigal Editor: Guccione Takes Another SPIN".

Check this box to receive email notification when other comments are posted.

**Sheldon Senzon** (/people/mrmediapro/) from **JMS Media, Inc.,** July 5, 2015 at 8:09 a.m.
Joe, great article and thanks for the walk down memory lane. I was at Vitt Media at the time and handled local advertising for Spin Magazine working with Ed Rasen. High on my list was Spin's one year anniversary party at a club called Private Eyes. Yes, fun days at 1965 Broadway with Bob Jr. and the folks at Spin.

**Reply ()**

Leave a Comment

Subscribe to *MediaPost Weekend*

enter your email address                                    Subscribe

More from MediaPost Weekend (/publications/mediapost-weekend/)



(/publications/mediapost-weekend/)